UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

        vs.

BRIAN DENNIS PIERCE,

        Defendant.
_____/

No. 1:23-cr-40-003

Hon. Jane M. Beckering
United States District Judge

## GOVERNMENT'S SENTENCING MEMORANDUM

Lobbyist Brian Pierce conspired with his business partner, Vincent Brown, and others to pay bribes to Rick Johnson, the Chair of the Michigan Medical Marijuana Licensing Board ("MMLB"), to curry favor for their clients, including a medical marijuana company ("Company C") seeking licenses from the Board. Pierce and Brown paid Johnson a total of $40,000 between June 2017 to November 2018 when Johnson was Chair of the MMLB, and at Johnson's request, Pierce paid a total of $2,000 to a Detroit stripper who was having commercial sex with Johnson. As a result, Company C was one of the first companies to obtain a license to operate in Michigan's new multimillion-dollar marijuana market and Pierce and Brown profited from their relationship with Johnson.

When lobbyists bribe government officials to help their clients and line their own pockets, they do more than just enrich themselves at public expense. Corruption robs citizens of access to services, exacerbates inequality, and distorts the marketplace. It is a fundamental threat to the rule of law: it erodes public trust in our government institutions, fuels cynicism toward those institutions, and inhibits effective and accountable governance. Pierce should receive a prison sentence within the advisory Guideline range and pay a substantial fine for his role in the offense.

## BACKGROUND

A. Facts

### 1. The Formation of the MMLB and Johnson's Appointment as Chairperson.

The MMLB was a five-member board created by Michigan's 2016 Medical Marijuana Facilities Licensing Act, which allowed dispensaries and other businesses to operate legally for the first time in the State of Michigan. *See* Mich. Comp. Laws § 333.27301 et seq. Under the new law, prospective marijuana businesses had to be qualified by and receive a license from the MMLB, which at the time had both the responsibility for implementing the new law and the power to fully administer it. *See* Mich. Comp. Laws § 333.27302. Three votes were required to approve license applications. *Id.*

Given the potential profits from this new and lucrative industry – which in 2022 generated $2.3 billion in sales in Michigan – many prospective businesses viewed these marijuana licenses as a golden ticket, a way to make a lot of money, especially if they could be among the first to the market. As Michigan's medical marijuana law and regulations were being developed, some businesses, including Company C, sought to limit the number of licenses to be issued by the state – to "keep the sandbox small," in their parlance, to attempt to increase their profits even further.

In 2017, Rick Johnson was appointed to be the Chair of the MMLB. From 2001 to 2004, Johnson served as the Speaker of the Michigan House of Representatives. From 2005 until his appointment to the MMLB he worked as a lobbyist in Lansing, Michigan. While in the private sector, and before the MMLB began operating, Johnson made it known that he was angling for an appointment to the Board. Johnson and others used his past and current political connections as leverage to obtain nearly $2 million in payments for his lobbying services from individuals and

entities related to the medical marijuana industry prior to his appointment to the MMLB. (R.82: Pierce PSR, ¶ 15)

Brian Pierce and Vincent Brown were lobbyists who did business together as Philip Alan Brown Consulting, LLC (PABC). PABC revenue was split evenly between Brown and Pierce. (*Id.*, ¶ 23, PageID.730)[1] Brown and Pierce partnered with a third person to form Michigan Grower's Consultants, LLC (MGC), a consulting business designed to represent the marijuana industry in Michigan. Pierce, Brown, and the third partner each had an equal stake in MGC. (*Id.*, ¶ 29, PageID.731) Pierce and Brown, through PABC and MGC, lobbied on behalf of various businesses seeking operating licenses from the MMLB, including on behalf of Company C. Brown was the primary contact with Company C due to his close relationship with one the company's principals. (*Id.*, ¶ 18)

### 2. The Bribery Scheme.

Before Johnson started serving on the MMLB, he was paid nearly $350,000 by PABC from funds that originated from Company C. As the date of his appointment neared, Johnson met with Pierce, Brown, and the third partner of MGC and reached an agreement to continue getting paid after his appointment. According to Johnson, he reached an agreement with Brown and Pierce to accept bribe payments from them to perform work on behalf of PABC's and MGC's marijuana clients who were seeking licenses from the MMLB. (*Id.*, ¶ 96) Johnson used his relationship and influence to demand money from Pierce and Brown. (*Id.*, ¶ 52) To disguise the nature of the payments, PABC ostensibly would pay Johnson's wife Janice $2,000 a month for "bookkeeping" services she never actually performed. (*Id.*, ¶ 30) Company C offered to give Johnson a

---

[1] Paragraph numbers 21 to 29 were inadvertently repeated on PageID.729 to PageID.731.

3

percentage of the company (according to Johnson, a one or two percent equity stake) and Johnson admitted he discussed that with Company C and PABC while he was on the MMLB. (*Id.*, ¶ 96)

Brown and Pierce also leveraged their relationship with Johnson to recruit and retain marijuana clients. (*Id.*, ¶ 18) Indeed, Brown sent a message to Pierce that said, "Our relationship w chair has got us most of our business." (*Id.*, ¶ 26, PageID.272) In September 2016, Brown sent a message to a Company C representative that said, "We own the board." (PSR ¶ 20) This was a reference to PABC owning Johnson as a result of the payments to him. (*Id.*) While Pierce and Brown were making the bribe payments to Johnson, they were in regular contact with him. They often spoke about the MMLB agenda and specific applicants Johnson thought would be "good." They knew such ex parte communications with the Board Chair violated state law. (*Id.*, ¶ 54)

Ultimately, Pierce and Brown paid Johnson a total of $42,000 in bribes to influence and reward Johnson in connection with his official duties as chair of the MMLB. Johnson, Pierce, and Brown used a number of LLCs to disguise the nature and source of the bribe payments of Johnson. Specifically, Pierce used bank accounts in the names of PABC, MGC, and a company called Flint River Flats, LLC to pay bribes to Johnson by depositing them in bank accounts he controlled in the names of JBJ Ranch, LLC and Common Cents Harvest Farms, LLC. The payments from PABC, MGC, and Flint River Flats were the method Pierce and Brown used to funnel money to Johnson from their work representing marijuana clients who had applied for licenses from the MMLB, including Company C and a Rhode Island marijuana company:

4

**Post-Appointment Payments to Johnson from PABC and MGC:**

| Date | To | Amount |
|---|---|---|
| 6/8/2017 | JBJ Ranch, LLC | $2,000 |
| 7/27/2017 | JBJ Ranch, LLC | $2,000 |
| 7/27/2017 | Common Cents Harvest Farms | $2,000 |
| 9/11/2017 | JBJ Ranch, LLC | $2,000 |
| 10/5/2017 | JBJ Ranch, LLC | $2,000 |
| 12/6/2017 | Common Cents Harvest Farms | $3,000 |
| 12/20/2017 | JBJ Ranch, LLC | $4,000 |
| 2/15/2018 | JBJ Ranch, LLC | $2,000 |
| | Total | $19,000 |

**Post-Appointment Payments to Johnson from Flint River Flats, LLC:**

| Date | To | Amount |
|---|---|---|
| 4/28/2018 | Common Cents Harvest Farms | $2,000 |
| 6/4/2018 | Common Cents Harvest Farms | $1,000 |
| 7/6/2018 | Common Cents Harvest Farms | $6,000 |
| 7/11/2018 | Common Cents Harvest Farms | $6,000 |
| 8/3/2018 | Common Cents Harvest Farms | $6,000 |
| | Total | $21,000 |

Additionally, at Johnson's request, Pierce paid a total of $2,000 to an individual who was regularly having commercial sex with Mr. Johnson. (*Id.*, ¶ 25, PageID.730)

To further conceal the bribes paid by Company C to Johnson, Company C falsely stated on its license applications that it had no financial relationship with Johnson. Johnson also failed to disclose his financial arrangements with Company C. Both omissions violated state law. *See* Mich. Comp. Laws § 333.27305.

### 3. Johnson's Official Acts in Exchange for the Bribes.

Johnson admitted that, in exchange for the bribes paid by Brown and Piece, he helped Company C with its application and helped get it through the process by talking to the Michigan Licensing and Regulatory Agency (LARA) and other MMLB members on its behalf. (*Id.*, ¶ 105) He also said he influenced the formation of rules to favor Company C by pushing for rules that favored Company C's interests in limiting the number of licenses and tracking the licenses to

accomplish Company C's desired grow operations. (*Id.*) He said he agreed to look after Company C's interest in becoming the biggest and best marijuana company in Michigan, and tried to have the MMLB voting agenda changed to make Company C and the other businesses who paid him the priority. (*Id.*, ¶ 96) He said it was important for Company C to be first on the agenda when votes were cast. (*Id.*, ¶ 97)

In exchange for the bribes, Johnson took several official acts as MMLB chair that supported license applications submitted by Company C, including voting in favor of its prequalification status in July 2018; voting in favor of its application for growing licenses in October and December 2018; voting in favor of its application for a processor license in February 2019; and voting in favor of its application for a provisioning center license in April 2019. (*Id.*, ¶ 28, PageID.731) As a result, Company C became one of the first in Michigan to be pre-qualified by the MMLB for full vertical cannabis operations—from marijuana cultivation to dispensing—and it quickly became the company with the most Class C licenses in the state. As Johnson himself put it, there was great value in being among the first companies to enter the medical marijuana market. (*Id.*, ¶ 93)

When the FBI interviewed Pierce in December 2020, he provided untruthful information regarding the payments to Johnson's wife. Specifically, Pierce falsely stated that Mrs. Johnson was getting paid by PABC for doing accounting work for it and MGC. Pierce also falsely stated that the payments ended after Johnson was appointed to the MMLB. (*Id.*, ¶ 36) He did, however, truthfully admit that Johnson engaged in sex acts with a Detroit-area stripper that were arranged and paid for by a Troy-area businessman while Johnson was Chair of the MMLB. Pierce also admitted making payments to the stripper on behalf of Johnson. (*Id.*, ¶ 38)

### B. The Plea Agreement

On May 12, 2023, Pierce pled guilty pursuant to a plea agreement to a felony information charging him with one count of conspiracy to commit bribery in violation of 18 U.S.C. §§ 371 and 666(a)(2). On May 30, 2023, the Court accepted the guilty plea and adjudicated him guilty.

The parties stipulated in the plea agreement that Pierce conspired with Vincent Brown and others to commit bribery and paid Johnson at least $42,000 in cash, gifts, and other things of value and that the payments were made corruptly to influence or reward Johnson in connection with his official duties as a member and Chairperson of the MMLB. (R.4: Pierce Plea Agreement, PageID.46)  At the time they made the payments to Johnson, Company C and other clients that retained their lobbying firm were seeking operating licenses from the MMLB. (*Id.*)  One object of the conspiracy was to obtain clients and generate profits for Pierce, Brown, and their lobbying companies by promoting their access to, and ability to influence, Johnson. (*Id.*) Another object was to reward and influence Johnson while he was serving as Chair of the MMLB to help their clients, including Company C, obtain operating licenses from the MMLB. (*Id.*)

Pierce also admitted that Johnson provided valuable non-public information about the anticipated rules and operation of the MMLB, and assisted with license application matters for Company C, while serving as MMLB Chair. (*Id.* at PageID.47)  From in or about July 2018 through in or about April 2019, Johnson voted in favor of approving the prequalification status of Company C and voted in favor of granting marijuana licenses to Company C. (*Id.*)

### C. The Presentence Investigation Report

The presentence report calculated Pierce's offense level as follows:

    Base Offense Level:      12

    Specific Offense Characteristic (payment of more than one bribe):      +2

7

| | |
|---|---:|
| Specific Offense Characteristic ($42,000 in bribe payments): | +6 |
| Specific Offense Characteristic (bribes to a high-level decision maker) | +4 |
| Acceptance of Responsibility: | -3 |
| Total offense level: | 21 |

Pierce has no prior criminal convictions, giving him zero criminal history point and placing him in criminal history category I. The advisory guidelines range is 37-46 months in prison and a fine of $15,000 to $150,000. The government filed a motion for a four-level downward departure under Guideline § 5K1.1 in recognition of Pierce's substantial assistance to law enforcement in the investigation and prosecution of another person who has committed an offense. If granted, the offense level becomes 17 and the advisory guidelines range becomes 24-30 months in prison and a fine of $10,000 to $95,000. If the Court varies downward by the equivalent of two levels to account for the proposed "zero-point" amendment to the Sentence Guidelines (as it did for co-defendants Dalaly and Johnson), the advisory guideline range would become 18-24 months in prison and a fine range of $7,500 to $75,000.

## ARGUMENT

### A. A Guidelines Prison Sentence is Appropriate.

Pierce should serve a prison sentence within the advisory Guidelines range. As this Court knows, the statutory maximum prison sentence for conspiracy to commit bribery is five years, but the sentence ultimately imposed must comply with the pertinent statutory sentencing factors established by Congress and codified at 18 U.S.C. § 3553(a), including:

### 1. The Need for the Sentence to Reflect the Seriousness of the Offense, and to Provide Just Punishment.

Section 3553(a) directs the Court to consider the need for the sentence to reflect the seriousness of the offense and to provide just punishment. These factors are among the most

important factors a court considers in a public corruption case and they counsel in favor of a significant prison sentence. Bribery of public officials is a very serious offense because that conduct severely damages the public trust in our government institutions:

> Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because . . . the public begins to think of politics as 'only for the insiders.' Thus corruption has the potential to shred the delicate fabricate of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels.

*United States v. Ganim*, No. 3:01CR263, 2006 WL 1210984, at *5 (D. Conn. May 5, 2006) (order denying resentencing of former mayor of Bridgeport).

More pointedly, the 26th President of the United States, Theodore Roosevelt, explained to Congress in 1903 that bribery is a threat to the existence of democracy itself:

> There can be no crime more serious than bribery. Other offenses violate one law while *corruption strikes at the foundation of all law*. Under our form of Government all authority is vested in the people and by them delegated to those who represent them in official capacity. There can be no offense heavier than that of him in whom such a sacred trust has been reposed, who sells it for his own gain and enrichment; *and no less heavy is the offense of the bribe giver*. He is worse than the thief, for the thief robs the individual, while the corrupt official plunders an entire city or State.... Government of the people, by the people, for the people will perish from the face of the earth if bribery is tolerated.

Theodore Roosevelt, Third Annual Message to the Senate and House of Representatives (Dec. 7, 1903) (emphasis added) *available at* The American Presidency Project of UC Santa Barbara, https://www.presidency.ucsb.edu/documents/third-annual-message-16.

Here, Pierce's bribes corrupted the process for the state's issuance of licenses for businesses to operate in a new and lucrative industry and ensured that Rick Johnson worked not in the interests of the citizens of Michigan, but in the interest of Pierce and the companies he represented. Individuals and businesses that were denied a license by the MMLB now may wonder whether they had a fair and equal opportunity to compete in the industry. Law-abiding qualified

applicants who did not have the ultimate insider "on the take" may have struggled with understanding and navigating what became a tedious and lengthy application and approval process. Although the government has no evidence that Johnson's receipt of bribe payments prevented other qualified applicants from ultimately obtain licenses, Pierce's and Johnson's illegal actions have significantly damaged the trust that law-abiding citizens placed in Johnson's work as Board Chair and in state government.

Moreover, Pierce's conduct cannot be described as a fleeting or one-time error in good judgment. Pierce's offense involved more than just one bribe. Pierce made regular cash bribe payments to Johnson 13 different times between June 2017 to November 2018. Pierce and Brown participated in a bribery scheme that sought to conceal their crimes by creating false cover stories, making false entries in the books and records of PABC and MGC, and referring to Johnson by an alias in text messages. Additionally, Pierce and Brown frequently met and conferred with Johnson while he served as the Chairperson of the MMLB to help their clients secure licenses as early as possible. A custodial sentence below the advisory guidelines range or a probationary sentence would fail to account for the harm he has inflicted by furthering public cynicism and distrust of elected officials and government processes.

### 2. The Need to Deter Criminal Conduct, Promote Respect for the Law, and Protect the Public.

The need to deter others from paying and receiving bribes may be the most important factor when sentencing Pierce for his offense. Corruption crimes threaten the core values of our country. For this reason, courts have found general deterrence to be a particularly important factor in sentencing corruption cases. *See United States v. Watkins*, 691 F.3d 841, 853 (6th Cir. 2012); *United States v. Anderson*, 517 F.3d 953, 966–67 (7th Cir. 2008); *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("[O]ne of the primary objectives' of sentencing elected officials

convicted of bribery is 'to send a message to other public officials that bribery is a serious crime that carries with it a correspondingly serious punishment.'" *Id.* at 450–51 (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013)); *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa 2017) ("It must be made plain to the public at large that behavior such as that exhibited by Defendant is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government.").

In this case, both a corrupt public official and some of the business interests who chose to influence him to secure licenses to operate in the medical marijuana industry have been brought to justice. This case presents the opportunity to deter others who might seek to corruptly influence those who serve in state government, either as an elected official or someone appointed to office by an elected official. This Court should send a clear message to those who might bribe public officials to gain an unfair economic advantage over their law-abiding competitors that there is real and serious punishment awaiting them in federal court.

**3. The Sentence Should Include a Substantial Monetary Fine.**

In addition to a prison sentence, the government seeks a monetary fine of at least $25,000. In determining the imposition of a fine, the Court should consider the same § 3553(a) factors it considered in fashioning a prison sentence, along with Pierce's ability to pay a fine, the expected costs to the government of any prison term and term of supervised release, and other pertinent considerations. *See* USSG § 5E1.2(c)(3). Pierce is able to pay a fine within the guideline range. (R.82: Pierce PSR, ¶ 194) Moreover, a fine would further deter him and others from criminal conduct, and it would cover some of the costs to the government for his anticipated imprisonment and supervised release.

11

                                    Respectfully submitted,

                                    MARK A. TOTTEN
                                  United States Attorney

Dated: October 4, 2023               /s/ *Christopher M. O'Connor*
                                  CHRISTOPHER M. O'CONNOR
                                  Assistant United States Attorney

                                  /s/ *Clay Stiffler*
                                  CLAY STIFFLER
                                  Assistant United States Attorney

                                  United States Attorney's Office
                                  P.O. Box 208
                                  Grand Rapids MI 49501
                                  (616) 456-2404
                                  christopher.oconnor@usdoj.gov
                                  clay.stiffler@usdoj.gov